**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **DAVID EDWARD GAUDETTE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **Vs.** | § | **Civil Action No. 1:23-CV-769-DII** |
| | § | |
| **ANGEL HEART HOSPICE, LLC, dba** | § | **Jury Requested** |
| **NEW CENTURY HOSPICE, Inc.,** | § | |
| **Defendant.** | § | |

**PLAINTIFF'S OBJECTIONS TO
ORDER AND REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

**TO THE HONORABLE JUDGE ROBERT PITMAN:**

In *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1754 (2020), the Supreme Court issued the landmark ruling that Title VII of the Civil Rights Act prohibits discrimination against an employee for being gay, or on the basis of the employee's sexual orientation or gender identity. In the few years since *Bostock,* courts have begun newly applying traditional discrimination concepts to people, in this case gay men, who have long been the subject of blatant, out-in-the-open derision, ridicule and discrimination and who were previously required to simply tolerate it.

This case presents facts showing blatant sexual orientation discrimination prohibited by *Bostock* and Title VII. However, the Report and Recommendation (Dkt. 24) holds as a matter of law under Rule 12(c), before any discovery has taken place, that a gay man could never make a showing of actionable disparate treatment, hostile work environment, constructive discharge, or retaliation based on Defendant's discriminatory actions and inactions. The Report and Recommendation mistakenly characterizes David Gaudette's case as complaining of one isolated incident, ignores the significant other allegations of discriminatory misconduct by the employer, compares the situation to inapplicable and distinguishable cases, and ultimately incorrectly holds as

a matter of law that what happened is not "severe," "extreme" or serious enough to ever be actionable or even worthy of a fair opportunity to conduct discovery.

The decisions of this Court and the Western District of Texas will impact not only Plaintiff David Gaudette, but are also looked to as guidance by other courts around the state and country as they consider *Bostock* and other cases of anti-LGBT discrimination. This decision will also impact other LGBT workers who regularly encounter such discrimination. Dismissal under Rule 12 "'is viewed with disfavor and is rarely granted." *Schumacher v. City of Round Rock*, No. 1:18-CV-334-RP, 2019 U.S. Dist. LEXIS 250039, at *6 (W.D. Tex. 2019) (Pitman, J.) (citing *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)).[1]

Plaintiff's Original Complaint sets forth sufficient facts at the motion to dismiss stage to state plausible claims. However, if the Court determines that the Original Complaint is lacking, Mr. Gaudette has filed a motion for leave (Dkt. 31) to file a First Amended Complaint (Dkt. 31-1) which includes additional details and allegations that certainly exceed Gaudette's pleading requirements. Respectfully, the Report and Recommendation should not be adopted and Defendant's motion to dismiss, motion to strike, and motion to stay discovery should be denied. Additionally, Mr. Gaudette should be given leave to file his First Amended Complaint.

## Mr. Gaudette's Factual Allegations Clearly Establish Plausible Claims of Hostile Work Environment, Constructive Discharge,

This case initially arises out of an offensive, outrageous and openly made anti-gay discriminatory slur mocking and ridiculing a gay employee, Mr. Gaudette. On or about September

---

[1] *Schumacher* was decided under Rule 12(b)(6). The motion to dismiss in the present case is under Rule 12(c), however, the Fifth Circuit applies the same standard to a Rule 12(c) motion as it does for a motion under Rule 12(b)(6). *Thompson v. Aerotek, Inc.*, No. 1-15-CV-116 RP, 2015 U.S. Dist. LEXIS 78238, at *2 (W.D. Tex. 2015) (Pitman, J.) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n. 8 (5th Cir. 2002).

15, 2021, a group of approximately 10 to 12 employees of New Century, including supervisory and management employees, met in a company conference room for an Interdisciplinary Group ("IDG") meeting. Plaintiff's First Amended Complaint, Dkt. 31-1 at ¶¶18-24.[2] The group was discussing a hospice case in which a female patient did not want a male nurse in her room. *Id.* at ¶ 22-23. During the discussion, a New Century employee openly told the group in an exaggerated and mockingly feminine manner that, "We can send David [Gaudette]. He's not really a man." *Id.* at ¶ 24. After the mocking slur, most of the dozen employees present openly burst into laughter in response to the statement. *Id.* at ¶ 25. Mr. Gaudette's Supervisor, who was a high-ranking company employee (Administrator/COO), David Godby, was present while the anti-gay slur was made and when the conference room broke into laughter, but sat in silence and did and said nothing, effectively condoning the discriminatory statement, ridicule and laughter. *Id.* at ¶ 26-27.[3]

New Century's discriminatory conduct escalated dramatically the following day, when another gay male employee who was present and witnessed the events at the IDG meeting privately went to Supervisor/Administrator Godby privately and objected to the anti-gay discrimination that took place at the meeting. *Id.* at ¶ 30. Supervisor Godby first acknowledged the blatantly

---

[2] Cites in this Objection to the allegations are to the proposed Plaintiff's First Amended Complaint (Dkt. 31-1), attached to Mr. Gaudette's separate Motion for Leave to Amend. This proposed First Amended Complaint provides more factual detail than the previously proposed First Amended Complaint (Dkt. 18-1) that was submitted as part of Plaintiff's Response in Opposition to Defendant's Motion on the Pleadings (Dkt. 18). Both 28 U.S.C. § 636(b)(1)(C), and Fed. R. Civ. P. 72(b govern objections to a magistrate's recommendations and provide that "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. . . . The judge *may also receive further evidence* or recommit the matter to the magistrate with instructions.") (Emphasis added.) Additionally, this Court has broad discretion to grant leave to amend to Mr. Gaudette and "should freely give leave when justice so requires." *See* FRCP Rule 15(a)(2).

[3] Mr. Gaudette was not actually present at the meeting but was informed about it by a gay coworker and confirmed it with two other coworkers. As discussed further *infra*, numerous courts have held that discriminatory comments and actions known by a plaintiff but made outside their presence are, in fact, proper and potentially compelling evidence of illegal discrimination.

discriminatory events and said he was looking into it, but then abruptly excused himself and went and spoke with New Century's executive director. *Id.* at ¶ 31. Godby returned a few minutes later after speaking with the top New Century management employee and reversed himself, falsely claiming that he never heard the anti-gay mocking of Mr. Gaudette and group laughter. *Id.* at ¶ 32. Supervisor Godby *then proceeded to pressure and encourage the reporting gay employee to resign*, telling him words to the effect of that he did not seem to be a "good fit'" for the company and that perhaps he should work somewhere else. *Id.* at ¶ 34. By doing so, New Horizons targeted and discriminated against another openly gay employee, attempted to silence opposition to anti-gay discrimination, and eliminate any witnesses to the outrageous anti-gay discrimination towards Mr. Gaudette. *Id.* at ¶ 34-36. The gay coworker responded telling Supervisor Godby that he was not, in fact, a good fit for a company where his supervisor would lie and at a company that would tolerate the abuse of gay employees like he witnessed the day before. *Id.* at ¶ 37. Although he needed a job and income, the gay coworker resigned on the spot. *Id.*

After targeting Mr. Gaudette's gay coworker and procuring his resignation, the company then took no further action about the situation. No one from New Century management contacted Mr. Gaudette about what had happened at the meeting. *Id.* at ¶ 43. New Century did not conduct any investigation about what happened and whether other anti-LGBT discrimination was occurring. *Id.* at ¶ 44.  New Century did not take any disciplinary or corrective action against the employee who openly made the anti-gay slur, the employees who openly laughed at the slur, or against Supervisor Godby, who remained silent and effectively condoned blatant and offensive anti-gay discrimination. *Id.* at ¶ 45. New Century did not take any action whatsoever to address the sexual orientation discrimination towards Mr. Gaudette or to protect him and other LGBTQ employees and prevent such discrimination from happening in the future. *Id.* at ¶ 46. In fact, the only action that had been

taken by New Century was to change stories, deny what had happened and attempt to cover it up, including by targeting and pressuring Mr. Gaudette's gay coworker, who opposed the sexual orientation discrimination, to resign. *Id.* at ¶ 47.

After Mr. Gaudette's gay coworker was targeted by and quit New Century, the coworker informed Mr. Gaudette of everything that had happened and advised him to "watch his back" at New Century. *Id.* at ¶ 38. Mr. Gaudette then reached out to a female coworker who had remotely attended the IDG meeting about what had happened. *Id.* at ¶ 41. This female coworker then reached out to another coworker who was present in person at the IDG meeting. The female coworker then confirmed to Mr. Gaudette what he had previously been told about the outrageous, offensive and mocking ridicule that had been directed at him because of his sexual orientation, the group laughter, the silence of Supervisor Godby and the failure of Godby or anyone else to take any action to stop or in any way indicate that the blatantly discriminatory conduct was in any way problematic, inappropriate, or would not be tolerated at New Century. *Id.*

Mr. Gaudette worked through the weekend and for five days after the IDG meeting to continue to provide care for his patients. *Id.* at ¶ 49. Although Mr. Gaudette needed a job to support himself and did not have any other employment lined up, on or about September 20, 2021, because the working conditions at New Century had become so untenable, Mr. Gaudette reasonably felt he had no other option and was compelled to resign his employment of four years. *Id.* These conditions included: (1) the outrageous, public and blatant anti-gay mocking, ridicule and discrimination towards him in the presence of a large group of coworkers and management; (2) the open laughter in response by numerous coworkers; (3) the silence of his supervisor and management at the time in front of numerous coworkers, essentially condoning the anti-gay discrimination; (4) New Century's then targeting and silencing of another gay coworker who came to management and opposed the

anti-gay discrimination against Mr. Gaudette, by soliciting, encouraging and procuring the gay coworker resignation for not being "a good fit;" (5) New Century's continued silence and failure/refusal to reach out to him and inform Mr. Gaudette of the discriminatory situation and whether anything was being do to address it; (6) New Century's failure and refusal to take *any* disciplinary or corrective action against *any* of the persons involved in the anti-gay discrimination, including Supervisor Godby, the person who made the slur, or the group of employees who openly laughed at it; (7) New Century's failure and refusal to conduct any investigation into what had happened, including whether other anti-gay discrimination was taking place; (8) New Century's failure take *any* other possible action to respond to and stop the blatant anti-gay discrimination at the company, and thus, its failure to protect Mr. Gaudette and other gay employees going forward; (9) New Century's and Supervisor Godby's reversal and change from initially acknowledging that there was a problem to lying, flatly denying and attempting to cover up the anti-gay discrimination that had taken place, which made clear to Mr. Gaudette that New Century would not take action to prevent anti-gay discrimination and further condoned what had already taken place; and (10) other actions and concerns, including the fact that other anti-gay discrimination was almost certainly taking place and simply being accepted, *Id.* at ¶ 56.

In his resignation email to New Century, Mr. Gaudette explained:

> I have been bullied and made fun of because of my mannerisms and the way that I sound since childhood. I am now 44 years old and had to hear from a virtual stranger that my coworkers, people who I considered to be personal friends, openly mock and laugh at me for those very same things when I am not around. I'll never know who laughed and who didn't and therefore will never be able to look at any of you in the same way. Please do not call me to say, 'I didn't laugh', or 'I didn't mean it that way', or most offensive, 'I was laughing at HER not YOU'. My heart is broken, and I am deeply saddened. My resignation is effective immediately. Don't worry, I did not badmouth our company to anyone over the weekend. That's just not who I am. I will turn in all equipment and the car later today, but I do have higher priority things to do first. I will not be on the call this morning.

*Id.* at ¶ 50.

After New Century received notice of his resignation/constructive discharge, New Century tried to convince Mr. Gaudette to return to work but did so by doubling down on the lies that no discriminatory statements, group laughter or other discriminatory actions had occurred. At the direction of New Century management, multiple employees contacted Mr. Gaudette, telling him that nothing had happened in the IDG meeting against Gaudette, and that he should remain employed by New Century. *Id.* at ¶ 51. However, these communications after the fact were contradicted by the credible accounts Mr. Gaudette had received from three other co-workers and only solidified that New Century would not address or protect him from anti-gay discrimination in the future. *Id.*

Approximately two weeks after his constructive discharge, New Century then sent Mr. Gaudette a letter dated October 5, 2021 falsely claiming that he had violated HIPAA and threatening him with the potential loss of his nursing license. *Id.* at ¶ 57. In fact, Gaudette had not violated HIPAA in any way and had actually legally and professionally acted to protect his patient's health and care. *Id.* New Century's retaliatory threat referred to Gaudette's license being "regulated by the State of Texas," referred to a "continuing legal duty," stated that "penalties for HIPAA infractions can be severe," and then suggested a *quid pro quo* alternative to taking action against Mr. Gaudette if the two could "peacefully coexist." *Id.* Such a knowingly false threat to a professional license could and would certainly dissuade a reasonable employee from continuing to pursue claims of discrimination, hostile work environment, and constructive discharge against New Century. *Id.*

## The Report and Recommendation Generally Cites
## The Correct Legal Standard, But Does Not Correctly Apply Those Standards.

The Report and Recommendation generally correctly cites the legal standards for a motion to dismiss under Rule 12, including that the court must "accept well-pleaded facts as true," and view

"them in the light most favorable to the plaintiff." *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins.,* 22 F.4th 450, 454 (5th Cir. 2022). [4] However, the Report incorrectly applies these standards.

As the Report notes, both the Supreme Court and the Fifth Circuit have held that an employment discrimination complaint at the pleading stage need not contain specific facts establishing a prima facie case of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002), *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019). Rather, a plaintiff need *only plead* sufficient facts on the *ultimate elements* of a disparate treatment claim to make their case plausible. *Id.* The Fifth Circuit is clear that there are *only two ultimate elements* a plaintiff must plead to support a disparate treatment claim under Title VII: "(1) an 'adverse employment action,' (2) taken against a plaintiff '*because of* her protected status.'" *Cicalese* 924 F.3d at 766 (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)). The Fifth Circuit stated, "We reiterate, however, that a court errs by requiring a plaintiff to plead something more than the 'ultimate elements' of a claim" or "inappropriately heightens the pleading standard by subjecting a plaintiff's allegations to a rigorous factual or evidentiary analysis." *Id.* at 767. In spite of this, the Report cites and heavily relies on the specific individualized elements of Mr. Gaudette's claims.

Additionally and importantly, as the district court in another sexual orientation hostile work environment and constructive discharge case explained, "[t]he Court need not conduct a summary judgment analysis at this stage concerning the severity of the alleged sexual orientation harassment of [the] Plaintiff." *Wilson v. City of Greenville*, No. 4:22CV64-GHD-DAS, 2023 U.S. Dist. LEXIS 192596, at *2-3 (N.D. Miss. 2023).[5] Similarly, in considering a Rule 12(b)(6) motion to dismiss a

---

[4] The Report omits that dismissal under Rule 12 is disfavored and rarely granted. *Schumacher* 2019 U.S. Dist. LEXIS 250039, at *6 (citing *Turner*, 663 F.3d at 775).

[5] The court in *Wilson* found that the plaintiff had met the pleading standard for both a hostile work environment case and constructive discharge where a city council person had insinuated that a heterosexual plaintiff was gay. *Id.*

hostile work environment claim in *Rico v. Family Emergency Rooms, LLC*, Magistrate Judge Howell observed the difference between summary judgment and motion to dismiss cases and the "highly fact intensive nature of these cases." No. 1:21-CV-0587-LY, 2021 U.S. Dist. LEXIS 257860, at *8 (W.D. Tex. 2021) (adopted by Judge Yeakel at No. 1:21-CV-587-LY, 2022 U.S. Dist. LEXIS 86688 (W.D. Tex. 2022)). Many of the cases relied upon in the Report and Recommendations to support dismissal under Rule 12 are, in fact, summary judgment cases requiring a heightened burden, are inapplicable and should be distinguished from use regarding this motion to dismiss on that basis alone.

### Mr. Gaudette's Factual Allegations Clearly Establish A Plausible Claim of Hostile Work Environment Based On Sexual Orientation Discrimination.

Initially, the Report and Recommendation begins its analysis of Mr. Gaudette's sexual orientation hostile work environment claim by citing to *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) for the proposition that "Sex discrimination consisting of same-sex sexual harassment also is actionable under Title VII." Dkt. 24, p. 6. While *Oncale* was an important case about an oilfield worker who was sexually harassed by male coworkers and held that Title VII protects against harassment from people of the same gender, Mr. Gaudette's case is *not a same-sex sexual harassment case*. Rather, Mr. Gaudette's employer subjected him to discrimination *because of his sexual orientation*, similar to cases in which Black, Hispanic or other racial minority employees are subjected to humiliating and offensive racial discrimination and the employer does nothing to remedy the situation. The Report and Recommendation primarily compares the facts of Mr. Gaudette's situation to cases in which an employee was sexually touched or subjected to sometimes outrageous sexual advances. While these cases have relevance in a general sense to hostile work environments, the emphasis on severe or pervasive *physical touching and sexual*

*assaults and advances* is misleading and implies an inapposite, incorrect basis for comparison or heightened bar to reach.

Importantly, the Report and Recommendation correctly states that the "*totality of the employment circumstances*" must be considered to determine hostile work environment. Dkt. 24, p. 7, *citing Wantou v. Wal-Mart Stores Tex., LLC*, 23 F.4th 422, 433 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 745 (2023) (emphasis added). However, the Report ignores the totality of circumstances pled by Mr. Gaudette and incorrectly characterizes his claims as simply complaining of an "isolated incident" and a "single comment." Mr. Gaudette sets forth facts alleging far more discriminatory actions and inactions by New Century and other circumstances supporting Mr. Gaudette's claims. While the sexual orientation discrimination originated from the openly made mocking, anti-gay slur in which a coworker stated in an exaggerated and mockingly feminine manner stating, "We can send David [Gaudette]. He's not really a man" (Dkt. 31-1 at ¶24), much more occurred after that. A group of approximately 12 other employees then openly laughed at the anti-gay slur. Mr. Gaudette's supervisor who was present, then chose to remain silent, ignore the blatant sexual orientation discrimination and effectively condone it.

*Beyond the events at the IDG meeting*, however, multiple other significant events occurred that form the "totality of circumstances" supporting Mr. Gaudette's hostile work environment claim. When Supervisor Godby was approached by another gay coworker who opposed the anti-gay discrimination at the meeting, Godby first acknowledged the discriminatory situation and said he was "looking into it." Then after talking with New Century's Executive Director, Godby lied and stated that nothing happened. New Century then *targeted the other gay coworker*, who had opposed the anti-gay discrimination, questioning whether he was "a good fit" and encouraging him to resign, which he did. New Century's targeting, soliciting and procuring of the resignation of Mr. Gaudette's

gay coworker is evidence of additional sexual orientation discrimination. It is also evidence that New Century was attempting to cover up and stifle any objections to sexual orientation discrimination.

After obtaining the resignation of the gay coworker, New Century then took absolutely no action to address the anti-gay discrimination, but to the contrary, continued to cover it up and lie that it never happened. New Century failed to inform Mr. Gaudette that anything had happened. New Century failed or refused to take disciplinary action against the employee who openly made the anti-gay slur, those who openly laughed at it, or against Supervisor Godby, who took no action during the IDG meeting (or afterwards) to address the anti-gay discrimination. New Century also failed or refused to conduct any investigation regarding the anti-gay discrimination, nor to determine if other evidence of anti-gay discrimination towards Mr. Gaudette or others had occurred. At the end of the day and based on the totality of circumstance, Mr. Gaudette and any other reasonable person in his shoes (including for example, his gay coworker), would (and did) reasonably feel compelled to resign and not be able to continue working for New Century under those circumstances.

The Report and Recommendation also makes a mistaken judicial assessment about the alleged lack of severity of the blatant anti-gay mocking of Mr. Gaudette.  First, as support for the conclusion that the anti-gay slurs, mocking and ridicule were not "severe," the Report relies on the fact that Mr. Gaudette was not present at the IDG meeting when the slur was made, his coworker burst into laughter, and his supervisor said and did nothing.  (Dkt. 24, p. 9.)[6] However, recent 5th Circuit case law is clear that Mr. Gaudette's presence at the meeting was not required. In *Abbt v.*

---

[6] The Report cites two cases as authority for this proposition, *Saketkoo v. Adm'rs of the Tulane Educ. Fund*, 31 F.4th 990, 1004 (5th Cir. 2022) and *Septimus v. Univ. of Hous.*, 399 F.3d 601, 612 (5th Cir. 2005). However, both of these cases are distinguishable and do not stand for the proposition for which they are cited. Rather, both found that incidents of harassment directed at *others*, during which the plaintiff was not present and presumably was unaware of at the time of employment, were not sufficient to establish a hostile work environment on summary judgment.

*City of Hous.*, 28 F.4th 601, 609 (5th Cir. 2022), the Fifth Circuit reversed a grant of summary judgment in a hostile work environment case in which a female firefighter found out that years before, her male coworkers had secretly and repeatedly watched an intimate video of her. The plaintiff was not present at the time the male coworkers watched the video and engaged in the sexually hostile/harassing behavior, but the court held that this was not required and stated, "we decline to hold as a matter of law that a person must contemporaneously experience harassment for it to be actionable under Title VII." *Id.* To the contrary, the Fifth Circuit focused on the harm caused to the plaintiff when she learned of the offensive conduct of her coworkers that took place years before behind her back. "Whether that harm can support a hostile work environment claim is a question for a jury, not a judge." *Id.* (*citing* with approval *Hirase-Doi v. U.S. West. Commc'ns., Inc.*, 61 F.3d 777, 782-83 (10th Cir. 1995); *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1505 (M.D. Fla. 1995) ("The extent of [the victims' knowledge] of [the harassing] activities and how this knowledge affected their perception of their working environments at different times is a question of fact.").)

Numerous other courts have also held evidence of harassment that occurred outside of the victim's presence can support a claim of hostile work environment (and constructive discharge). *See, e.g.*, *Moore v. Kuka Welding Systems*, 171 F.3d 1073, 1079 (6th Cir. 1999) (the term "nigger-rigging" was not used within plaintiff's hearing or directed at him, but he knew that the derogatory term was being used); *Hurley v. Atlantic City Police Dept.*, 933 F. Supp 396, 410-11 (D.N.J. 1996) (testimony about sexually derogatory "locker-room" conversations between men, when women were not present at all, was properly admitted); *Torres v. Pisano*, 116 F.3d 625, 633 (2nd Cir. 1997) (the fact that many of the harassing statements were not made in the plaintiff's presence was "of no matter; an employee who knows that her boss is saying things of this sort behind her back may reasonably find

her working environment hostile"); *Brumback v. Callas Contractors*, 913 F. Supp. 929, 939 (D. Md. 1995).

Beyond the fact that Mr. Gaudette did not have to be present when he was being publicly ridiculed and mocked for being gay, and that this was not simply "one comment" or an "isolated incident," the Report also unfortunately and mistakenly dismisses the severity of the anti-gay slurs and ridicule that occurred. The Report notes that the Fifth Circuit in 2022 held that a single incident in which a supervisor called a plaintiff employee a "Lazy Monkey A__N__ in front of his fellow employees—states an actionable claim of hostile work environment." *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022).

It is extremely difficult, unnecessary and likely inappropriate for the Court[7] to make a judicial determination on the relative severity and offensiveness of racial slurs as compared to anti-gay, homophobic slurs.  However, it is wrong to diminish and dismiss as not "severe" the incredibly offensive public ridicule of Mr. Gaudette by his coworkers, including openly stating in an exaggerated and mockingly feminine manner, "We can send David [Gaudette]. He's not really a man," the laughter of numerous coworkers, and the acquiescence of Mr. Gaudette's supervisor, who said nothing and went along with the painful discriminatory slur. (Dkt. 31-1 at ¶¶ 24-26.)

As set out in Plaintiff's First Amended Complaint, being made fun of, mocked, ridiculed and bullied has severe consequences for gay men (and other LGBTQ individuals). Scientific studies by United States Centers for Disease Control and Prevention have established that high school students who are gay, bisexual or "not sure" about their sexual orientation are approximately 6 times more likely to have seriously considered suicide than heterosexual male high school students – 60.9

---

[7] Whether discriminatory comments are sufficiently "severe" or "pervasive" is ultimately a question for a jury.

percent of gay, bisexual and "not sure" male high school students have seriously considered suicide versus 10.2 percent of heterosexual students. Kann L, McManus T, Harris WA, et al. "Youth Risk Behavior Surveillance — United States, 2017." MMWR Surveill Summ 2018; 67(No. SS-8):1–114. DOI: http://dx.doi.org/10.15585/mmwr.ss6708a1external icon. *Id.* at ¶11 Adult gay men also suffer severe harm from being made fun of, mocked, ridiculed and bullied for their sexual orientation. The scientific literature is robust and clear that anti-gay discrimination, including anti-gay slurs and homophobic conduct in the workplace, causes serious harm. *See e.g.* Sears, B., & Mallory, C. (2014), "Employment Discrimination against LGBT People: Existence and Impact," *Gender Identity and Sexual Orientation Discrimination in the Workplace: A Practical Guide*, https://escholarship.org/uc/item/9qs0n354; Marieka Klawitter*, "*Meta-Analysis of the Effects of Sexual Orientation on Earnings*,"* 54 Indust. Rel. 4, 13 (2014). The harm includes psychological damage, impacts on physical health, and economic harm. *Id.* at ¶12

Finally, the Report and Recommendation fails to address or give any weight to the fact that Supervisor Godby, a high ranking employee of New Century, was present in the IDG meeting, heard the openly made, blatantly discriminatory, mocking anti-gay slur, the laughter of many of the approximately 12 employees present in response to the ridicule, but remained silent and refused to speak out against the discrimination, thereby condoning the conduct and sending a message that such discrimination is acceptable.  In *Woods*, the Fifth Circuit emphasized the significance of *a supervisor's* actions *in front of other employees*. 29 F.4th at 285.  While *Woods* involved a supervisor using an incredibly offensive racial slur (the "N-word"), a supervisor's actions or inactions in the face of discriminatory slurs made in front of a group of employees is certainly a significant factor in "totality of circumstances" contributing to a hostile work environment. In *Brumback*, the court found that it did not matter if a racist comment was made to individuals other than the plaintiff: "In fact a

contrary inference is warranted. This ... bears witness to tolerance by upper management...of such behavior.  In addition, the more people before whom [the harasser] demonstrated such conduct without any repercussions, the more reasonable it is that the working environment as a whole ... was abusive.") 913 F. Supp. at 939.

Ultimately, Mr. Gaudette pled sufficient facts to support a plausible hostile work environment claim. The Report and Recommendation's determination that Mr. Gaudette (or any other LGBT person in his shoes) cannot state a claim as a matter of law for this anti-gay discriminatory conduct is incorrect and should not be followed.

### Mr. Gaudette's Factual Allegations Clearly Establish A Plausible Claim of Constructive Discharge Based On Sexual Orientation Discrimination.

The Report and Recommendation incorrectly determined that Mr. Gaudette failed to plead sufficient facts as a matter of law to support a claim of constructive discharge. However, Mr. Gaudette's factual allegations of blatant sexual orientation discrimination, which fully support a legal claim of hostile work environment, are also more than sufficient to plausibly assert a claim for constructive discharge.

Importantly among the recognized factors cited by the Report for determining whether an employee's working conditions are "sufficiently intolerable," is "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." (Dkt 24 at p. 10, *citing Newbury v. City of Windcrest, Tex.,* 991 F.3d 672, 677 (5th Cir. 2021).) As set forth *supra* and in Mr. Gaudette's First Amended Complaint (Dkt 31-1), the blatantly discriminatory statements in the IDG meeting, the group laughter, and Supervisor/Administrator/COO Godby's silence and failure to indicate in any way that the discriminatory behavior was not acceptable, was certainly humiliating and harassing. Moreover, New Century's actions (and inactions) that followed, including targeting Mr. Gaudette's gay coworker after he opposed the discrimination and encouraging him to

resign for not being a "good fit," New Century's reversal and false denial that any discriminatory actions had occurred, as well as New Century's complete refusal and failure to take any corrective action at all, easily constitute harassment and humiliation calculated to encourage Mr. Gaudette's resignation.

In discussing Mr. Gaudette's constructive discharge claim, the Report and Recommendation incorrectly identifies four points which it states Mr. Gaudette "argues" are the reasons he was forced to quit.[8] Notably, the Report, which was written before and without the benefit of Plaintiff's First Amended Complaint (Dkt. 31-1), uses the term "allegedly discriminatory comments" to describe the offensive, clearly discriminatory statement by Mr. Gaudette's coworker, said in an exaggerated mockingly feminine tone that "David [Guadette] is not really a man."  If given leave to amend, Mr. Gaudette's First Amended Complaint would certainly provide additional details and facts that would dispel any doubt that the statements were, in fact, discriminatory based on Mr. Gaudette's sexual orientation. The Report further incorrectly summarizes Mr. Gaudette's constructive discharge allegations, stating, "In essence, Gaudette argues that he was compelled to resign because he was experiencing a hostile work environment and was dissatisfied with his supervisor's handling of the situation." Dkt. 24 at 11.  As set forth supra, Mr. Gaudette's First Amended Complaint identifies at least ten compelling factual reasons that forced Mr. Gaudette to resign.

The Report also asserts that Mr. Gaudette cannot plausibly plead a claim of constructive discharge because he did not complain before he resigned because of the blatant anti-gay discrimination at New Century. (Dkt. 25 at p. 12) "Thus, he gave New Century no real opportunity to redress the alleged discrimination." *Id.* However, Mr. Gaudette knew that his gay coworker *had*

---

[8] Referring to Mr. Gaudette's factual allegations as "arguments" appears in conflict with Rule 12 standards that require factual allegations must be accepted as true.

complained about the anti-gay discrimination, and that in response to this complaint New Century suggested that he was not "a good fit," "that perhaps he should work somewhere else" and procured his resignation.  *Id.* at ¶ 34.[9] Mr. Gaudette was aware that *after* the complaint about the anti-gay discrimination, New Century took absolutely no action to redress the discrimination but instead took action to cover it up, eliminate the one person who had complained about it, and deny that it happened. Additionally, when New Century attempted to convince Mr. Gaudette to stay on, it doubled down on its lie with several company employees texting Gaudette claiming that nothing had happened in the meeting, in contrast to the statements of the gay coworker and two other employees who were in attendance. New Century had ample opportunity to redress the anti-gay discrimination, but it was abundantly clear that they chose to not do so and instead, took affirmative, discriminatory and retaliatory steps to cover up that it even happened. Thus, the well pled facts establish that Mr. Gaudette had no choice but to resign when he did and that any complaint before his resignation would have been futile.

<u><strong>Mr. Gaudette's Factual Allegations<br>Clearly Establish A Plausible Claim of Retaliation.</strong></u>

Gaudette's retaliation complaint is straightforward. Less than three weeks after two gay men opposed blatant, highly offensive sexual orientation discrimination and quit their jobs because of New Century's actions and inactions surrounding the situation, New Century sent Gaudette a written letter that alleged false violations of HIPAA. The letter referred to Mr. Gaudette's nursing license being "regulated by the State of Texas," that "*penalties for HIPAA infractions can be severe*," (emphasis added) "consequences" and oddly stated that "we are happy to peacefully coexist." Given the false nature of the allegations, the fact that it was sent within weeks of Mr. Gaudette opposing

---

[9] Mr. Gaudette also confirmed what happened at the IDG meeting with two other credible coworkers who attended the meeting and had witnessed the discriminatory actions.

New Century's outrageous sexual orientation discrimination, the letter could certainly be viewed as a threat to Mr. Gaudette's nursing license and an attempt to dissuade him from continuing to complain about discrimination against New Century.[10]

The Report concludes that Mr. Gaudette's retaliation claim should be dismissed because as a matter of law, Mr. Gaudette could not establish an "adverse employment action." For an action to be an "adverse employment action" in a retaliation claim, Mr. Gaudette need only plead that he was subjected to an action that "might dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) Moreover, as the Supreme Court recognized in *Burlington*, what might seem trivial to some might in fact deter others from complaining of discrimination depending on the specific facts. "*Context matters*." 548 U.S. at 69 (emphasis added). Moreover, what would deter a reasonable employee from opposing discrimination "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id. Burlington* significantly changed the standard for determining an adverse employment action from prior cases, and the standard is different and lower for retaliation claims than for discrimination claims. *See e.g. Williams v. City of Austin*, 170 F. Supp. 3d 939, 948 (W.D. Tex. 2016) (Sparks, J.).

The cases cited by the Report and Recommendation are easily distinguishable and inapplicable in the present situation. *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) and *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) were both decided before

---

[10] If Mr. Gaudette complained about the circumstances leading to his constructive discharge, that would be the opposite of New Century's proposal to "peacefully coexist" and therefore subject Mr. Gaudette to a HIPAA violation report to state authorities, action by the state, and potential loss of his license; all three of which would be onerous.

*Burlington,* when the standard for an adverse employment action in a retaliation case was significantly higher. *Williams v. City of Austin*, 170 F. Supp. 3d at 950 and *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 470 (5th Cir. 2021) were decided on summary judgment after discovery and after the parties were able to fully develop the "constellation of surrounding circumstances, expectations, and relationships" required to be determined by *Burlington.* Finally, *Lee v. Bexar Cnty.*, No. SA-22-CV-1149-OLG, 2023 WL 3150090, at *3 (W.D. Tex. Mar. 29, 2023), determined there was no adverse employment action in the context of a discrimination claim, which at the time required a much higher standard of showing "an ultimate employment decision," completely different from what was required under *Burlington* for a retaliation claim.[11] Mr. Gaudette clearly meets the pleading requirement for an adverse employment action in a retaliation claim and the Report and Recommendation should not be adopted.

### Disparate Treatment Sexual Orientation Discrimination

New Century misrepresented that Mr. Gaudette only pled three claims, hostile work environment, constructive discharge, and retaliation (Dkt. 13.), instead of the four in the Original Complaint, which also includes a claim for disparate treatment based on sexual orientation. Additionally, New Century only moved to dismiss those three claims and not the disparate treatment claim. The Report and Recommendation followed suit.

Because New Century failed to move to dismiss Gaudette's disparate treatment discrimination claim, it is arguably not before the Court. However, this missing disparate treatment discrimination claim holds particular significance given the recent Fifth Circuit opinion in *Hamilton*

---

[11] As discussed *infra*, the standard for determining an adverse employment action in a discrimination claim has recently been changed significantly and lowered by the Fifth Circuit *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023), and the Supreme Court opinion in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024).

*v. Dallas County* and the more recent Supreme Court opinion in *Muldrow v. City of St. Louis*. These cases made paradigm changes to judicial review of discrimination claims. *Hamilton* eliminated the "ultimate employment action" requirement for adverse discriminatory actions. 79 F.4th at 497. *Muldrow* ended a need to show "significant harm requirement" for certain pleaded adverse actions. 144 S. Ct. at 975.

These cases both recognized that Title VII textually only prohibits "discriminat[ing] against" an individual "with respect to" the "terms, conditions, or privileges of employment because of that individual's [sex/sexual orientation]." *Muldrow* explained that "discriminate against" refers to "differences in treatment that injure" employees. Terms or conditions is not used "in the narrow contractual sense," it covers more than the "economic or tangible." 144 S. Ct. at 974. To plead a case, a plaintiff "must show some harm respecting an identifiable term or condition [or privilege] of employment" without also having to show that the harm was "significant," or "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." 144 S. Ct. at 970.

In *Hamilton*, the Fifth Circuit held that use of the broad language of "term, condition, or privilege of employment" in the statute "evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected and unprotected] employees in employment." 79 F.4th at 501. Any "benefits that comprise the incidents of employment, or that form an aspect of the relationship between the employer and employees," the Court explained, falls within Title VII's ban on discrimination. *Id.* at 501-502.

In this case, Gaudette has sufficiently plead that he was denied equal access to, and therefore left worse off from the absence of, the following identifiable "terms, conditions, or privileges of

employment," or benefits and understandings between employees and employers, because of his sexual orientation:

- denial of managerial protection from discriminatory comments made in the workplace about Gaudette,
- denial of equal application of policies that are supposed to protect all employees from discrimination in the workplace,
- denial of equal access to investigations that are supposed to follow complaints of discrimination in the workplace,
- denial of truthful communications from the employer and management representatives regarding discriminatory comments made in the workplace about Gaudette,
- knowingly pressuring co-workers to resign after they complained about discriminatory comments and laughter about Gaudette,
- knowingly pressuring coworkers to perpetuate the lie to Gaudette that no discriminatory comments and laughter occurred against Gaudette in the workplace,
- subjecting Gaudette to false allegations of a HIPAA violation and a threatened loss of nursing license through a report to the Nursing Board that the employer knew was not a HIPAA violation, and
- denying Gaudette the understanding and confidence that his employer will protect him and tell him the truth as an employee every day moving forward.

Gaudette has adequately plead that he had been subjected to disparate "identifiable terms, conditions, or privileges of employment" because of his sexual orientation. As such, Gaudette respectfully requests that the Report and Recommendation not be adopted and that New Century's three motions be denied (Motion to Dismiss, Motion to Strike, and Motion to Stay) be denied, and such other and further relief that the Court determines justice and equity so require.

Respectfully submitted,

_/s/ Robert Notzon_

Robert Notzon

The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
Robert@NotzonLaw.com
(512) 474-7563
(512) 852-4788 facsimile

Robert W. Schmidt
Robert W. Schmidt Law Firm, PLLC
State Bar No. 17775429
bob@robertwschmidt.com
1502 West Avenue
Austin, Texas 78701
Telephone:  (512) 484-2276
Facsimile:  (512) 537-0708

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on May 15, 2024, in accordance with the Federal Rules of Civil Procedure on the following parties via the Court's electronic filing system:

Kevin S. Mullen
The Mullen Firm PLLC
kevin@themullenfirm.com

/s/ Robert Notzon
Robert Notzon